**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| 401 SOUTH 18TH STREET, LLC, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT F. O'LOUGHLIN, | ) |
| | )   Case No. |
| USH, LLC, | ) |
| | ) |
| and | ) |
| | ) |
| USH WEST, LLC, | ) |
| | )   **JURY TRIAL DEMANDED** |
|      Defendants. | ) |
| | ) |
| **HOLD SERVICE** | ) |

<u>**VERIFIED COMPLAINT**</u>
**(Injunctive Relief and Damages for Easements by Necessity or Implication,**
**Statutory Establishment of Private Road and Prima Facie Tort)**

Plaintiff 401 South 18th Street, LLC, by and through its undersigned counsel, for its causes of action against Defendants Robert F. O'Loughlin, USH, LLC and USH West, LLC, states as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff owns four commercial buildings within the St. Louis Union Station development.  Defendants USH, LLC and USH West, LLC, which Defendant O'Loughlin owns and controls, owns other Union Station properties, including various parking areas.  Plaintiff brings this action to remedy Defendants' wrongful conduct in, among other things, (1) using their access control gates to the Union Station parking areas to deny Plaintiff and its business invitees access to Plaintiff's own properties, and (2) in other instances, conditioning such access, or the ability to

park in spaces Plaintiff itself owns or controls, on payment of exorbitant and improper charges amounting to as much as $1,050 per month, per vehicle.

2.      It is readily apparent that Defendants' conduct reflects a scheme to place Plaintiff in a financial stranglehold and thereby force Plaintiff to accede to Defendants' efforts to acquire Plaintiff's properties for many millions of dollars below their market value.  Thus, Defendants are engaging in a scheme to maliciously injure Plaintiff, which Plaintiff also seeks to remedy by this action.

## PARTIES AND JURISDICTION

3.      Plaintiff 401 South 18th Street, LLC ("Plaintiff" or "401 LLC") is a limited liability company organized and existing under the laws of the State of Missouri.  Its sole member is a citizen and resident of the State of Texas.  Accordingly, for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a), Plaintiff is a citizen of Texas.

4.      Defendant Robert F. O'Loughlin ("O'Loughlin") is a citizen and resident of the State of Missouri.  O'Loughlin, through his wholly-owned entity, RKO GM, LLC, is the manager of those entities.  At all pertinent times, O'Loughlin directed and controlled the acts and omissions of Defendants USH, LLC and USH West, LLC that are the subject of this action.

5.      Defendant USH, LLC ("USH") is a limited liability company organized and existing under the laws of the State of Missouri.  On information and belief, its members are individuals and/or entities who are citizens and residents of states other than the State of Texas. Accordingly, for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a), USH is a citizen of one or more states other than Texas.

6.      Defendant USH West, LLC ("USH West") is a limited liability company organized and existing under the laws of the State of Missouri.  On information and belief, its members are

2

individuals and/or entities who are citizens and residents of states other than the State of Texas. Accordingly, for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a), USH West is a citizen of one or more states other than Texas.

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) in that Plaintiff, on the one hand, and all Defendants, on the other, are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims in this action occurred within this District, the property that is the subject of this action is situated within this District, and this action may affect possession of or title to the property.

## FACTUAL BACKGROUND

### Description of Relevant Properties

9.      Plaintiff and Defendants are the current owners and successors in interest to properties located within the St. Louis Union Station development.  As referenced herein, the St. Louis Union Station development consists of the following lots, which are identified visually on the map attached hereto as Exhibit A, and specifically described by the legal descriptions included within the Parking Agreement appended hereto as Exhibit B:

Lot 1 or Main Terminal and Train Shed Parcel – owned by USH West (The legal description of Lot 1 included in Exhibit B actually includes all the other lots, but Lot 1 referred to herein refers only to the parcel depicted on Exhibit A as Lot 1.);

Lot 2 or West Parking Parcel – owned by USH and USH West;

Annex Building – owned by 401 LLC (lot and building coterminous; lot does not have a number on Exhibit A but is located between Lots 3 and 4);

Lot 3 – separated by 18th Street, not the subject of this litigation;

SL 3666838.7

Lot 4 or Parking Parcel – owned by USH;

Lot 5 or Powerhouse and Theatre Parcel – owned by 401 LLC; and

Lot 6 or Grand Central Parcel – owned by 401 LLC.

10.     The foregoing properties also are depicted and labeled on the aerial photograph attached hereto as Exhibit C, in their condition as of November 17, 2017.  As shown by these exhibits, Lots 5 and 6 are surrounded by the 18th Street viaduct and a related severe grade change to the east, train tracks to the south and west, and Defendants' properties to the west and north. Plaintiffs' Lots 5 and 6 do not have direct vehicular access to 18th Street or any other public street.

**History of Union Station Development**

11.     Union Center Redevelopment Corporation ("UCRC") was a Missouri corporation formed under The Urban Redevelopment Corporations Law of Missouri (Mo. Rev. Stat. Chapter 353) in March, 1976.  It dissolved in 2009.

12.     In December, 1976, the City of St. Louis Board of Aldermen enacted Ordinance No. 57286, approving a Development Plan, pursuant to Mo. Rev. Stat. Ch. 353, submitted by UCRC for the St. Louis Union Station development.

13.     In 1979, the St. Louis Board of Aldermen enacted Ordinance No. 57828, designating the Union Station Historic District for the St. Louis Union Station development to control development, approving and incorporating by reference a document recorded with the St. Louis Recorder of Deeds titled "Staff Report Union Station Historic District" ("Staff Report"). The Staff Report was certified by the St. Louis Community Development Agency and accepted by the Clerk of the St. Louis Board of Aldermen on behalf of the Board.  It called for approval of, among other things, parking facilities on the properties by the St. Louis Landmarks and Urban Design Commission.

4

14.     In 1981, the St. Louis Board of Aldermen enacted Ordinance No. 58219, approving a Redevelopment Plan pursuant to Mo. Rev. Stat. §§ 99.300, *et seq*., ratifying and providing additional means to implement the Development Plan approved under Ordinance No. 57286 for the St.  Louis Union Station development.  Ordinance No. 58219 required development of the Union Station properties as described therein, including private and public parking facilities for the entire development that would provide "sufficient parking at ground level, subsurface, multilevel or otherwise as required by appropriate zoning ordinances."

15.     Also in 1981, the St. Louis Board of Aldermen enacted Ordinance No. 58294, amending Ordinance No. 57286 and approving an Amended Development Plan submitted by UCRC for the St. Louis Union Station development, to control the use of the properties for a period of 25 years, through 2006, including parking "to meet user demand" that is "well lighted and landscaped" and "secure through the use of security patrols."

16.     In January, 1986, the Land Clearance for Redevelopment Authority for the City of St. Louis recorded with the St. Louis Recorder of Deeds its Certificate of Completion of Improvements, certifying that improvements, including parking areas, for the St. Louis Union Station development had been completed throughout the development area as required by the applicable ordinances, and pursuant to the Development Plan.

17.     In September, 1986, in connection with a loan from Teachers Insurance and Annuity Association of America ("Teachers"), UCRC and other parties granted and recorded with the City of St. Louis Recorder of Deeds a Deed of Trust ("Teachers DOT") on certain of the St. Louis Union Station properties, with the collateral (identified on page 2) including, among other things, present and future "easements" (of which the Teachers DOT mandated performance [¶ 41])

5

and "other rights, liberties and privileges" related to such properties, including mandated parking requirements (¶¶ 34,45).

18.     In September, 1987, UCRC, as the developer under St. Louis Ordinances Nos. 57286 and 58294, and other parties entered into and recorded with the City of St. Louis Recorder of Deeds an "Agreement Restrictive Indenture Regarding Parking Availability and Land Uses with Respect to Certain Properties Located in the St. Louis Union Station Redevelopment Area Defined in the Development Plan Approved by City Ordinance Number 57286 as Amended by City Ordinance Number 58294" ("1987 Parking Agreement").  That agreement prescribed parking requirements throughout the development area to induce Mercantile Bank to make a loan to fund development of an office building and movie theatre building on the "Powerhouse Parcel," Lot 5.

19.     In September, 1989, UCRC and other parties entered into and recorded with the City of St. Louis Recorder of Deeds a "Restated and Amended Agreement of Restrictive Indenture" ("1989 Parking Agreement"), amending the 1987 Parking Agreement to induce Aetna and Mercantile Bank to make further development loans for another building on the Union Station properties, referred to as "Grand Central," on Lot 6, and addressing, among other things, parking and traffic easements throughout the development.

20.     In October, 1991, the Teachers DOT was modified by a document recorded with the City of St. Louis Recorder of Deeds, which provided for principal payments based upon gross revenues, including, among other things, revenues from parking.

21.     In September, 1998, the Teachers DOT further was modified by a document recorded with the City of St. Louis Recorder of Deeds, in part to emphasize that the scope of the encumbered collateral included present and future revenues, development and use agreements, interests, easements, and improvements such as parking.  As modified, the Deed of Trust describes

6

SL 3666838.7

and applies to a large portion of the Union Station Development Area depicted in Exhibit A hereto, but not Lots 5 and 6 or the Annex parcel.

**1999 Parking Agreement**

22.     In May, 1999, UCRC, as the developer of the St. Louis Union Station Redevelopment Area pursuant to City Ordinance No. 57286, as amended by Ordinance No. 58294, and the other lot owners and lessors of the Union Station property, entered into and recorded with the City of St. Louis Recorder of Deeds, a "Parking and Access Agreement" (the "Parking Agreement").  The Parking Agreement was expressly made to replace the prior common parking arrangements, *i.e.*, the 1987 Parking Agreement and 1989 Parking Agreement.  (A copy of the Parking Agreement is appended hereto as Exhibit B.).

23.     The Parking Agreement uses the term "Development Area" to mean the land described in Exhibits 1 through 6 attached thereto, and the term "Tract" to refer to any portion of such land.  Exhibit 1 to the Parking Agreement describes the entire development area, including Lot 1 – the Main Terminal and Train Shed now owned by USH West, and the Annex Parcel now owned by Plaintiff.  Exhibit 2 to the Parking Agreement describes Lot 2 – the West Parking Parcel, west of 20th Street, a portion of which is now owned by USH West, and the remainder of which is now owned by USH.  Exhibit 3 to the Parking Agreement describes Lot 3 – property east of 18th Street (which has been released from the agreement).  Exhibit 4 to the Parking Agreement describes Lot 4 – the Parking Parcel now owned by USH.  Exhibit 5 to the Parking Agreement describes Lot 5 – the Powerhouse and Theatre Parcel now owned by Plaintiff.  Exhibit 6 to the Parking Agreement describes Lot 6 – the Grand Central Parcel now owned by Plaintiff.

24.     The Parking Agreement stated that it was to inure to the benefit of the owners of all Tracts in the Development Area and their respective successors and assigns, and that it was "[t]he

7

parties' intention that ... the covenants, agreements, promises, easements, restrictions, benefits and obligations hereunder shall constitute servitudes, burdening each Tract and benefiting each Tract as provided in this Agreement as real rights running with the land."  (Page 10, § 16).

25.     The Parking Agreement further stated that it "and all the easements, rights and obligations hereof shall continue in perpetuity" and that it "may not be terminated or amended without the prior written consent of the 'Developer' identified therein, the Owners of all the Tracts subject thereto, certain leaseholders and subleaseholders, and all mortgagees with first priority mortgages on Tracts in the Development Area." (Page 10, § 13).

26.     Under the terms of the Parking Agreement, all of the Union Station properties would be "conveyed, encumbered, leased, occupied, used, improved and transferred subject to this Agreement."  (Page 10, § 16).

27.     Under the Parking Agreement, UCRC was designated as the "Developer" of Union Station.   The Developer holds certain rights regarding construction and alterations of Union Station.   More specifically, UCRC as the Developer had the right to make modifications to the access and parking facilities located in Union Station.  The Developer's rights were assignable by UCRC or its successor-in-interest by recording an amendment to the Parking Agreement in the St. Louis City Records, but there is no known such amendment.   Additionally, if UCRC no longer owned a lot in the Union Station property, then the successor Developer would be deemed to be the owner of the portion of Union Station last conveyed by UCRC. (Page 2, § 1(c)).

28.     In addition to defining the Developer's rights, the Parking Agreement set forth the parties' agreements concerning access to and parking within Union Station.   The Parking Agreement defines "Common Access Facilities" as including all roads, driveways, accessways,

8

sidewalks, landscaped areas, and walkways existing from time to time within the Development Area.  (Page 2, § 1(a)).

29.     Also, the Parking Agreement defined "Common Parking Facilities" as "all parking areas existing from time to time within the Development Area."  (Page 2, § 1(b)).

30.     Under the terms of the Parking Agreement, the present and future owner of Lots 5 and 6 (currently Plaintiff) were granted a perpetual easement to all Common Access Facilities (pages 2-3, § 2),

> for the benefit of each such Owner and their respective tenants, subtenants, concessionaires and licensees and for the benefit of the respective partners, officers employees, agents, customers and invitees of each of such parties, as an easement appurtenant to and for the benefit of each such Owner's Tract (and as to any Tracts which are not adjacent to each other, as an easement in gross), the perpetual non-exclusive right, privilege and easement to use the Common Access Facilities for pedestrian and vehicular access to and from [Lots 5 and 6].

31.     Likewise, an easement, perpetual in nature, was granted to the present and future owners of Lots 5 and 6 (now Plaintiff) with respect to the Common Parking Facilities.  (Page 3, § 3).

32.     The Parking Agreement also specified that Parking Fees are to be charged for use of the Common Parking Facilities, and the proceeds are to be allocated among the lot owners, including to cover parking maintenance costs.  Specifically, the Parking Agreement provided (Page 3, § 5):

> The parties acknowledge that the Common Parking Facilities are open to the general public and that a "Parking Fee" is assessed for each motor vehicle entering the Development Area for purposes of offsetting the cost of operating, maintaining, repair and replacing the Common Parking Facilities. In recognition of the foregoing, the present and future owners of [Lot 5] and [Lot 6], and their respective tenants, subtenants, concessionaires and licensees and the respective partners, officers, employees, agents, customers and invitees of each of such parties, shall be charged a standard Parking Fee for the use of the Common Parking Facilities at a rate not to exceed the rate charged to the general public. The collected Parking Fees shall be allocated among the Owners of the Tracts containing Common Parking Facilities

9

(and/or the designated operator of the Common Parking Facilities) in a manner acceptable to such parties pursuant to separate written agreements.

33.     Plaintiffs and Defendants' respective lots contain Common Parking Facilities within the meaning of the Parking Agreement; the owners thereof incur costs to maintain those facilities, which Section 10 of the Parking Agreement states are to be covered in the manner set forth in that section; and Plaintiff and Defendants each are entitled to a share of the Parking Fees under the terms of the Parking Agreement.

34.     There is no known additional agreement regarding the allocation of Parking Fees other than the Parking Fees being distributed "in a manner acceptable to such parties."

35.     In 2001, Lot 3 was subdivided by plat as the First Addition to Union Station Subdivision, and UCRC and others released a portion of Lot 3 from the Parking Agreement.

**The Parties' Acquisition of Interests in Union Station Properties**

*Lots 1, 2 and 4*

36.     On or about March 4, 2003, Regency Savings Bank, F.S.B., as successor in interest to the Teachers DOT, foreclosed on Lots 1, 2 and 4, and those lots were sold with all related collateral, including parking agreements, to St. Louis Union Station Holdings, Inc. ("SLUSH") in a transaction whereby SLUSH acquired both the Teachers DOT and the property by deed under foreclosure.

37.     In 2005, in connection with a sale, UCRC and others released portions of Lot 3 from the Parking Agreement.  In the release document, the signatories acknowledged that the Parking Agreement was still in effect, two years after Regency Savings' foreclosure of the Teachers DOT.

38.     In 2006, the Amended Development Plan, approved by City of St. Louis Ordinances Nos. 57286 and 58294, expired according to its terms.

SL 3666838.7

39.     In March, 2008, SLUSH conveyed Lots 1, 2 and 4 to Union Station Holdings, LLC via quitclaim deed.

40.     In October, 2012 Union Station Holdings, Inc. conveyed Lots 1, 2 and 4, via warranty deed, to Defendant USH.

41.     On December 11, 2012, Defendant USH conveyed Lot 1, via quitclaim deed, to Defendant USH West, LLC.

### Lots 5 and 6 and Annex Parcel

42.     On or around November 26, 2008, J.P. Morgan Commercial Mortgage Finance Corporation foreclosed on Lots 5 and 6, including all rights of those lots relating to the Parking Agreement.  Lots 5 and 6, including the related rights under the Parking Agreement, then were sold to U.S. Bank Association on December 19, 2008.

43.     In May and July, 2011, U.S. Bank Association conveyed to Plaintiff, via special warranty deed, Lots 5 and 6, subject to, among other title exceptions, covenants, terms and provisions of the Parking Agreement.

44.     On or around May 4, 2009, UCRC conveyed, via special warranty deed, in lieu of foreclosure, the Annex Parcel to LBCMT 1998-C4 Post Office Annex Building, LLC ("Post Office LLC").  This is the last known document in which UCRC is shown conveying a portion of the St. Louis Union Station properties.

45.     On December 19, 2011, Post Office LLC sold the Annex Parcel to Plaintiff.

46.     Based on the foregoing transactions, Plaintiff is the current fee owner of Lots 5, 6 and the Annex Parcel, and Lots 5 and 6 include Common Parking Facilities as defined in the Parking Agreement, including spaces under the 18th Street viaduct per easement from the State

11

of Missouri.  USH is the current fee owner of Lot 4 and a portion of Lot 2, which contain Common

Parking Facilities as defined in the Parking Agreement.  USH West, LLC, is the current fee owner

of Lot 1 and a portion of Lot 2, which contain Common Parking Facilities as defined in the Parking

Agreement.

47.     None of the transactions recited above purported to terminate the Parking

Agreement.  Nor, on information and belief, has there ever been a quiet title or other action to

eliminate the Parking Agreement, or any other release of rights under the Parking Agreement other

than the two partial releases concerning Lot 3 referenced above.

**The Parties' Communications and Later Disputes as to the Parking Agreement**

48.     On or about August 6, 2013, Plaintiff, acting through James Ryffel, sent an e-mail

to Robert O'Loughlin (a copy of which is appended hereto as Exhibit D), stating in part:

> I am going to be in town next Thursday and Friday morning. Would you like to
> visit to go over a couple of important issues.
>
> Most important is parking.
>
> Our current parking agreement which is a mess calls for Tenants and guests to pay
> for parking however there is a parking revenue share on Powerhouse and Grand
> Central which is not being done. The parking share revenue agreement is for us to
> share all parking revenue generated from the parking from all purposes less
> maintenance cost. The Post Office Annex which is separately platted has an
> easement for parking which is supposed to be at no cost but tenants and guests are
> being charged.
>
> My proposal on parking would be to simplify things by having a new parking
> agreement which calls for no charge for parking for tenants and guests and you
> keep 100% of all of the other parking revenue.  We would accomplish this by tenant
> parking stickers on cars and signed visitor passes a tenant would give a guest.
>
> Next is the development agreement and restrictive covenants. I would like to amend
> and replace it with a new one which eliminates the developer among other things.
> Currently the developer which by definition is the owner of our buildings has
> approval rights over any remodeling or renovation. That does not work for you and

12

possible in the future does not work for us. We do not want the responsibility of approving your or our remodeling….

49.     On or about October 3, 2013, Defendant O'Loughlin sent a letter to James Ryffel, with a copy to Securitas Security Services USA, Inc. (a copy of which is appended hereto as Exhibit E), in response to a "draft Acknowledgment of Parking Rights that you proposed regarding [Securitas] and its need for parking at St. Louis Union Station in the event you lease space to Securitas in the Powerhouse Building."  O'Loughlin's letter stated:

> We have checked with our legal counsel, who has reviewed the Parking and Access Easement that was attached to your proposed Acknowledgement.
>
> Since USH, LLC controls parking within Union Station, we intend to respect the pertinent recorded easements in effect when we acquired the property. Consistent with what I previously communicated, USH, LLC is not obligated nor inclined to sign any acknowledgements or additional agreements that could change the parking rights of any parties set forth in the Parking and Access Easement, which has been in effect since 1999. Under the existing Easement, tenants of the Powerhouse Building have the perpetual, non-exclusive right to use the Common Parking Facilities in Union Station for vehicular parking. The same parking is open to the general public, so tenants of all affected properties share parking with the public and other tenants on a first come, first served basis. All tenants parking in any lots within Union Station will be charged a standard parking fee at a rate not to exceed the rate charged to the general public, consistent with the existing Easement.

50.     On or about June 6, 2014, Plaintiff sought formal confirmation from Defendants that the Parking Agreement remained in effect by sending a letter and proposed Certificate, certifying that the agreement is in full force and effect, and requesting that the Certificate be executed and returned.  (Copies of the said letter and proposed Certificate are appended hereto as Exhibit F.).

51.     On or about June 16, 2014, in accordance with Section 17 of the Parking Agreement, Defendant O'Loughlin, on behalf of Defendant USH, provided a Certificate to Plaintiff (a copy of which is appended hereto as Exhibit G), certifying that: "Pursuant to Section 17

SL 3666838.7

of the Parking and Access Agreement, USH hereby confirms that the Parking and Access Agreement is in full force and effect and unmodified and that, to the best knowledge of USH, no default exists under the Parking and Access Agreement."  In so doing, Defendants did not execute the proposed Certificate provided by Plaintiff; rather, Defendants and/or their counsel drafted their own Certificate and provided it to Plaintiff.

52.     On or around February 27, 2015, Plaintiff again informed Defendants that, under the Parking Agreement, it is the Developer who is supposed to be receiving a portion of Parking Fees under Section 5 of the Parking Agreement.  On or about March 11, 2015, Defendants responded through counsel and, in that response, for the first time, asserted that the Parking Agreement no longer was in effect and thereby repudiated the Parking Agreement.  (A copy of Defendants' counsel's letter is appended hereto as Exhibit H).  In his letter, Defendants' counsel stated, "the Parking and Access Agreement was wiped out and terminated by the foreclosure on the property in 2003 under the TIAA Deed of Trust."  Significantly, Defendants' counsel's letter further stated, "I know Mr. O'Loughlin is still interested in possibly purchasing your properties himself if a fair price can be agreed upon …."

53.     Plaintiff immediately responded to Defendants' new assertion repudiating the Parking Agreement, sending an e-mail dated March 12, 2015 to Defendants and their counsel (copy appended hereto as Exhibit I), asserting that the Parking Agreement remained in effect. Since then, Plaintiff at all times has maintained, and continues to maintain, that the Parking Agreement remains in full force and effect.

54.     Defendant USH operates access control gates to collect Parking Fees from any person who parks on Plaintiff's or Defendants' Lots, and to control and limit access to all portions of the St. Louis Union Station properties, including the lots owned by Plaintiff.

14

55.     Defendants have refused and failed to distribute monies generated from the Common Parking Facilities to Plaintiff, despite Plaintiff's demands that they do so.

56.     Plaintiff never has collected or received any Parking Fees from the Common Parking Facilities located in the St. Louis Union Station development, including from its Lots 5 and 6.

57.     Defendants USH and USH West have performed work on Tracts in the St. Louis Union Station development since December 19, 2011, without seeking approval from Plaintiff as the Developer, including construction of an aquarium and a ferris wheel.

**Prior Litigation**

58.     In January, 2016, Plaintiff filed a lawsuit in the Circuit Court of St. Louis County, Missouri, against Defendants USH, USH West and Robert F. O'Loughlin, styled *401 South 18th Street, LLC v. Robert F. O'Loughlin, et al.*, Case No. 16SL-CC00140 (the "County Lawsuit").  In the County Lawsuit, Plaintiff alleged, among other things, claims for breach of the Parking Agreement.

59.     On July 10, 2018, the Court in the County Lawsuit entered an order granting partial summary judgment in favor of Defendants USH and USH West on Counts I, II and III of Plaintiff's Second Amended Petition, on the premise that the 2003 foreclosure of the Teachers DOT was pursuant to a 1986 deed of trust, that was senior in time and not subordinated to the 1999 Parking Agreement, and that the purchaser at the foreclosure sale and any successors in title, including USH and USH West, acquired their interests free of any restrictive covenants in the Parking Agreement.  In so ruling, the Court apparently rejected, albeit without expressly addressing, Plaintiff's arguments that the present circumstances embody recognized exceptions to the general rule that the foreclosure of a deed of trust extinguishes interests junior to it, including that: (1) the

15

Parking Agreement was a benefit to lenders and owners, intended to survive any foreclosure; (2) the Parking Agreement reflected regulatory requirements imposed by City of St. Louis Ordinances as a condition of approving the Union Station development, which survive foreclosure; and (3) at most, the foreclosure may have permitted a foreclosing entity to terminate the Parking Agreement, as opposed to requiring it to do so or effecting such termination as a matter of law, and no foreclosing entity took any action to seek to terminate the Parking Agreement.

60.    The partial summary judgment order remains interlocutory in nature, and is not a final judgment, in that Plaintiff retains appeal rights which it has not yet exercised as they are not currently ripe.  However, the partial summary judgment order precludes the Parking Agreement from being utilized to address the access issues which have arisen subsequent to the entry of the partial summary judgment order, as addressed below.

**Defendants' Subsequent Denials of Access to Plaintiff's Property and 1,000 Percent Increase in Parking Charges to Plaintiff's Tenants**

*1,000 Percent Increase in Parking Charges to Plaintiff's Tenants*

61.    Prior to January 1, 2020, Defendants allowed tenants of Plaintiff's Union Station properties to utilize parking in the Union Station parking facilities that Defendants control by purchasing monthly parking passes for the same monthly parking rate Defendants charged to their own tenants – approximately $90 per month.

62.    However, starting on or about January 1, 2020, Defendants have refused and failed to issue new monthly parking passes for Plaintiff's tenants at the same monthly rate Defendants charge to their own tenants.  Instead, Defendants are demanding that persons needing such new t monthly parking passes pay hourly/daily fees for access and parking, which are vastly in excess of

16

the previous monthly charge.  Such hourly/daily parking fees can total as much as $1,050 per month per vehicle/parking space.

63.     As a partial illustration of the harm and damages Plaintiff is suffering, and will continue to suffer, as a result of Defendants' foregoing conduct, in 2019, Plaintiff entered into a lease with Build-A-Bear Workshop, Inc. (the "Build-A-Bear Lease"), leasing to Build-A-Bear 51,600 square feet of space, spread over four floors, in the Grand Central Building.  Build-A-Bear's occupancy under the Lease is expected to commence in April or May, 2020, and the initial lease term is eleven years.  The Build-A-Bear Lease requires that Plaintiff make available to Build-A-Bear up to 250 parking spaces, with Plaintiff paying one-half of the cost of those spaces during the initial lease term.

64.     If Defendants' charges for the 250 parking spaces required under the Build-A-Bear Lease are predicated on the monthly parking fees Defendants were charging to Plaintiff and its tenants prior to January 1, 2020, Plaintiff's parking costs over the life of the lease would be $1,485,000 ($90 [monthly parking fee] x 250 [parking spaces] x 12 [months] x 11 [years] ÷ 2 [Plaintiff's share of parking costs]).  In contrast, predicating Plaintiff's share of the parking costs under the Build-A-Bear Lease on the parking fees Defendants are charging subsequent to January 1, 2020, Plaintiff's share of those parking costs over the life of the lease could amount to as much as $17,325,000  ($1,050 [monthly parking fees] x 250 [parking spaces] x 12 [months] x 11 [years] ÷ 2 [Plaintiff's share of parking costs]) – an incremental cost to Plaintiff of $15,840,000.

65.     Further, if the Parking Agreement no longer is in effect, Plaintiff has the right to charge for parking that occurs on its own property and retain those parking revenues.  Plaintiff currently has the capacity to park 87 vehicles on its own property.  And, in light of Defendants' conduct that is the subject of this action, Plaintiff plans to demolish the theatre building and, in its

17

place, create additional surface parking for 175 vehicles. If and when those plans are completed, Plaintiff will have 262 parking spaces on its own property.

66.     Absent the Parking Agreement being in effect, Plaintiff should have the right to collect and retain all parking fees generated from parking spaces on its own property. At a monthly rate of $90 per parking space, such revenues would aggregate $282,960 per year. However, Defendants are denying Plaintiff the right and opportunity to generate those parking revenues by using their access control gates to deny Plaintiff and its Business Invitees the ability to access Plaintiff's parking spaces on its own property unless they pay the exorbitant fees Defendants charge to pass through their access control gates. Moreover, to the extent those parking spaces are utilized, Defendants are seeking to charge as much as $3,301,200 per year (262 [parking spaces] x $1,050 [monthly fees per space] x 12 [months]) in respect of such usage, and retain those revenues for themselves, not sharing them with Plaintiff, notwithstanding the fact that the parking spaces are situated on Plaintiff's own property.

### Defendants' Denying Plaintiff's Business Invitees Access to Plaintiff's Property

67.     As noted above, Plaintiff has adopted, and is attempting to implement, plans to demolish the theatre building on Plaintiff's Union Station property, to make room for additional parking spaces and thereby endeavor to accommodate most or all of Build-A-Bear's parking needs with parking spaces on Plaintiff's own property. However, absent the relief sought by this lawsuit, Plaintiff's plans, even if implemented, will not ameliorate the harm and damages alleged above because parking spaces on Plaintiff's own property are accessible only through the access control gates that Defendants have erected and maintain between the adjoining public streets and the Union Station development, and Defendants are charging persons and vehicles who pass through those

18

gates the full amount of Defendants' hourly/daily parking fees even if they are passing through the gates in order to park in spaces on Plaintiff's own property.

68.     In addition, and causing further harm and damages to Plaintiff, Defendants are thwarting Plaintiff's plans to demolish the theatre building and construct additional parking spaces on its own property by refusing to allow contractors, representatives of local utility companies, and other workers (collectively, "Plaintiff's Business Invitees") to pass through their access control gates to gain access to Plaintiff's property, in order to perform the work needed to demolish the theatre building and create the additional parking spaces.  For example, Defendants' representative Craig Cobler stated in an e-mail, dated April 2, 2020 (copy appended hereto as Exhibit J): "There can be NO access through our property for any improvements without our written permission. Any and all construction equipment will be turned away at the gate."  Thus, Defendants denied entry into the Union Station development, through their access control gates, to Plaintiff's Business Invitees, when their destination was Plaintiff's property, irrespective of their willingness to pay Defendants' hourly/daily parking charges during the time they are working on Plaintiff's premises, and stated that they will continue to do so.

69.     In the same vein, at another time, Defendants stated in an e-mail from counsel dated April 21, 2020 (copy appended hereto as Exhibit K): "our position remains that any vehicles that do not have monthly parking passes, including construction vehicles, must take a ticket and pay the daily rate applicable to the general public;" vehicles must comply with the weight limits set forth in the 1999 Parking Agreement – notwithstanding Defendants' position that the Parking Agreement is no longer in effect; "any construction vehicles that take tickets for entry onto its property [must] verify the weight of the vehicles (loaded and unloaded) to the satisfaction of [Defendants] before entry will be allowed;" and Defendants are "open to consideration of

SL 3666838.7

alternative arrangements for access to the property, but only upon a global resolution of all issues between the parties and dismissal of your client's lawsuit." Accordingly, it is clear that Defendants are continuing to obstruct access to Plaintiff's property, and are using that obstruction as a lever to attempt to coerce Plaintiff to sell its property to Defendants for millions of dollars below its market value.

70.     Defendants' foregoing acts and omissions have created conflicts and disputes between Plaintiff and Build-A-Bear with respect to parking to be provided under the Lease, the costs of that parking and who should bear those costs, which threaten the ongoing performance of the Build-A-Bear Lease. While the potential harm and damages to Plaintiff from the foregoing are substantial, the outcome of any dispute between Plaintiff and Build-A-Bear, and Plaintiff's ability to remedy the harm and damages through an award of monetary damages, are highly uncertain. Accordingly, the foregoing harm to Plaintiff is irreparable, for which Plaintiff has no adequate remedy at law.

71.     Defendants' foregoing acts and omissions also are causing harm and damages with respect to Plaintiff's relationship with other of its tenants, as well as future prospective tenants, and Plaintiff's ability to remedy that harm through monetary damages similarly is highly uncertain. Accordingly, that harm is irreparable and Plaintiff has no adequate remedy at law to remedy it. As just one example, another of Plaintiff's tenants manifested an intention to add employees to its operations and lease additional space from Plaintiff to house them; however, the uncertainty over the availability and cost of parking for such additional employees, and particularly, the prospect of having to pay as much as $1,050 per month, per vehicle, for such parking, has served to deter the leasing of additional space.

20

## COUNT I
### (Common Law Easement by Necessity – Defendants USH and USH West)

72.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 71 above.

73.     As alleged above, prior to 1999, UCRC owned all the properties in the Union Station development that became subject to the 1999 Parking Agreement.

74.     While it owned all such properties that became subject to the 1999 Parking Agreement, UCRC completed the improvements consisting of the parking areas and related access drives and drive aisles within the Union Station development and, specifically, the access drive that allows vehicular access to and from the public street known as 18th Street, along a route approximately 40 feet wide, generally adjacent to the north and west boundaries of Plaintiff's Lots 5 and 6, to the parking areas south and east of Plaintiff's buildings on Lot 5 (Powerhouse and Theatre) and Lot 6 (Grand Central) (hereafter the "Common Access Drive").

75.     The said Common Access Drive from 18th Street to the parking areas on Plaintiff's Lots 5 and 6 is essential for Plaintiff and its Business Invitees to have vehicular access to such parking areas from a public street, in that there is no reasonable alternative means for such access.

76.     Defendants are obstructing use of the Common Access Drive by Plaintiff and its Business Invitees by means of their access control gates and exorbitant parking fees.

77.     Insofar as Defendants allow access to Plaintiff's Union Station property through Defendants' access control gates to Plaintiff and its Business Invitees, conditioned upon their paying Defendants' parking charges, those parking charges have increased to as much as $1,050 per vehicle, per month, from and after January 1, 2020, which is wholly unreasonable and

21

unconscionable and serves to prevent and deter Plaintiff and its Business Invitees from making full and reasonable use of Plaintiff's property.

78.     Moreover, Defendants refuse to allow some of Plaintiff's contractors, workers and other Business Invitees through their access control gates in order to perform work on, or visit, Plaintiff's property, irrespective of their willingness to pay Defendants' exorbitant parking charges.  By Defendants' foregoing conduct, Plaintiff is being denied the benefit of those persons' services and presence on its property, and Defendant's conduct is preventing Plaintiff from, among other things, performing demolition work on the theatre building and constructing new parking spaces on the footprint of the theatre building, so as to be able to meet the parking requirements of the Build-A-Bear Lease and of other tenants and prospective tenants.

79.     Absent recognition of the easement sought, Defendants' conduct will continue to cause Plaintiff to suffer substantial damages and harm, which is ongoing and irreparable, and for which Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays the Court to enter judgment in its favor and against Defendants USH and USH West on this Count; enter a declaratory judgment that the Common Access Drive described in this Count is a permanent easement of necessity, available for use by Plaintiff, its tenants, and all employees, contractors, visitors and Business Invitees of Plaintiff or its tenants; grant a temporary restraining order, and preliminary and permanent injunctive relief, barring Defendants from impeding, interfering with or refusing to recognize the said easement rights in any manner, including but not limited to barring access through their access control gates, or charging any access or parking fees at their access control gates; award compensatory damages to Plaintiff, from Defendants USH and USH West, jointly and severally, to the extent, if any, that Plaintiff's harm and damages are capable of being remedied through money damages, in an amount

to be proven at trial, in excess of $75,000 exclusive of interest and costs; award to Plaintiff from Defendants, jointly and severally, its costs incurred in prosecuting this action, including reasonable attorney's fees, as well as pre and post-judgment interest; and grant such other and further relief as the Court may deem just and proper.

## COUNT II
### (Common Law Easement by Implication – Defendants USH and USH West)

80.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 79 above.

81.     Plaintiff asserts the claim set forth in this Count as an alternative to the claim set forth in Count I.

82.     The Common Access Drive described above was intended to be a permanent means of access to the parking areas on Plaintiff's Lots 5 and 6, which would continue after UCRC sold such lots, as confirmed by the 1999 Parking Agreement and the prior versions of that agreement, and as further confirmed by the conduct of the parties, their predecessors and their lenders prior to Defendants' repudiation of the Parking Agreement in 2015.

83.     Present in this action are all of the elements necessary to establish an implied easement from pre-existing use, namely: (1) unity and subsequent separation of title; (2) obvious benefit to the dominant estate, Lots 5 and 6, and burden to the servient portion of Defendants' premises, existing at the time of UCRC's conveyances of the pertinent properties, and at the time of subsequent conveyances of those properties; (3) use of the premises by the common owner with the Common Access Drive being used as described above, long enough before UCRC's conveyances of the pertinent properties and under such circumstances as to show that its use as a

23

means of access to Lots 5 and 6 was intended to be permanent; and (4) reasonable necessity of the easement.

84.     Absent recognition of the easement sought, Defendants' conduct will continue to cause Plaintiff to suffer substantial damages and harm, which is ongoing and irreparable, and for which Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays the Court to enter judgment in its favor and against Defendants USH and USH West on this Count; enter a declaratory judgment that the Common Access Drive described in this Count is a permanent easement by implication, available for use by Plaintiff, its tenants, and all employees, contractors, visitors and Business Invitees of Plaintiff or its tenants; grant a temporary restraining order, and preliminary and permanent injunctive relief, barring Defendants from impeding, interfering with or refusing to recognize the said easement rights in any manner, including but not limited to barring access through their access control gates, or charging any access or parking fees at their access control gates; award compensatory damages to Plaintiff, from Defendants USH and USH West, jointly and severally, to the extent, if any, that Plaintiff's harm and damages are capable of being remedied through money damages, in an amount to be proven at trial, in excess of $75,000 exclusive of interest and costs; award to Plaintiff from Defendants, jointly and severally, its costs incurred in prosecuting this action, including reasonable attorney's fees, as well as pre and post-judgment interest; and grant such other and further relief as the Court may deem just and proper.

### COUNT III
### (Establishment of Private Road Pursuant to
### Mo. Rev. Stat. § 228.342 – Defendants USH and USH West)

85.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 84 above.

SL 3666838.7

86.     Plaintiff asserts the claim set forth in this Count as an alternative to the claims set forth in Counts I and II.

87.     Plaintiff is the owner of Lots 5 and 6 in the Union Station development from which there is no access to a public road.  The legal description of Lots 5 and 6 is set forth in Exhibit B hereto.

88.     Defendants USH and USH West are the owners of the property over which Plaintiff proposes a private road be established.  The legal descriptions of Defendants' property – Lots 1, 2 and 4 in the Union Station development – are set forth in Exhibit B hereto.

89.     No public road passes through or alongside Plaintiff's property described above.

90.     There is a strict necessity that a private road be established across Defendants' property from Plaintiff's property described above, so that Plaintiff's property connects with 18th Street without the restrictions, prohibitions and charges currently being imposed by Defendants, in that there is no access to a public road through Plaintiff's aforesaid property; there is no public road running along Plaintiffs aforesaid property, because 18th Street to the east is on an incline to a viaduct over the railroad tracks; and for the other reasons alleged above.

91.     The proposed route of the private road is along the existing Common Access Drive from the public street known as 18th Street, along a route approximately 40 feet wide generally adjacent to the north and west boundaries of Plaintiff's Lots 5 and 6, to the parking areas south and east of Plaintiffs buildings on Lots 5 (Powerhouse and Theatre) and 6 (Grand Central), to allow unrestricted and free access to Plaintiff's land and buildings.

92.     The proposed private road is situated on existing pavement and would do no damage or injury, and cause no inconvenience, to Defendants.

WHEREFORE, Plaintiff prays the Court to enter judgment in its favor and against Defendants USH and USH West on this Count; establish a private road across the property of Defendants along the existing Common Access Drive from the public street known as 18th Street, along a route approximately 40 feet wide generally adjacent to the north and west boundaries of Plaintiff's Lots 5 and 6, to the parking areas south and east of Plaintiff's, to allow unrestricted and free access to Plaintiff's land and buildings; grant a temporary restraining order, and preliminary and permanent injunctive relief, barring Defendants from impeding, interfering with or refusing to recognize the said private road in any manner, including but not limited to barring access through their access control gates, or charging any access or parking fees at their access control gates; award to Plaintiff from Defendants, jointly and severally, its costs incurred in prosecuting this action, including reasonable attorney's fees, as well as pre and post-judgment interest; and grant such other and further relief as the Court may deem just and proper.

**Count IV**
**(Prima Facie Tort – All Defendants)**

93.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 92 above.

94.     For a number of years, Defendant O'Loughlin, individually or on behalf of Defendants USH and/or USH West, has undertaken various efforts to purchase Plaintiff's Union Station properties from Plaintiff, albeit for many of millions of dollars less than their market value.

95.     The conduct of Defendants, as directed and controlled by Defendant O'Loughlin, in, among other things, denying Plaintiff and its Business Invitees access to Plaintiff's own property within the Union Station development, and charging Plaintiff, its tenants and their Business Invitees exorbitant charges, of as much as $1,050 per month, for parking and access –

26

even to park on Plaintiff's own property – constitutes part of a scheme by them to place Plaintiff in a financial stranglehold and thereby attempt to force Plaintiff to accede to their efforts to acquire Plaintiff's Union Station properties at a price many millions of dollars below their market value.

96.     Defendants' foregoing conduct represents malicious intent to injure Plaintiff and constitutes a prima facie tort under Missouri law.

97.     Insofar as Defendant's aforesaid acts and omissions otherwise were lawful, they were undertaken intentionally.

98.     Defendants' said acts and omissions were undertaken with the intent to injure Plaintiff by forcing it to sell its Union Station properties to Defendants for many millions of dollars below their market value, thereby damaging Plaintiff and unjustly enriching Defendants.

99.     Defendants' foregoing conduct has resulted in injury to Plaintiff even in the absence of Plaintiff's acceding to Defendants' efforts to force Plaintiff to sell its properties for many millions of dollars below their market value, in that, among other things, Plaintiff has been damaged by its inability to proceed with demolition of the theatre building and construction of additional surface parking on Lots 5 and 6; Plaintiff further has been damaged by its and its tenants, and their Business Invitees having to pay excessive and exorbitant charges for access and parking, even when the parking is in spaces that Plaintiff owns or controls; and Plaintiff further has been damaged by Defendants' refusal and failure to pay to Plaintiff its appropriate share of the parking fees generated from the Union Station development, including but not limited to parking fees from spaces owned or controlled by Plaintiff.

100.     There is no proper justification for Defendants' conduct.  Alternatively, to the extent such justification is claimed to exist, it is insufficient to warrant the harm and damages Defendants have caused Plaintiff to suffer.

SL 3666838.7

101.    Defendants' aforesaid conduct was and is outrageous because of Defendant's evil motive or reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays the Court to enter judgment in its favor and against Defendants O'Loughlin, USH and USH West on this Count; award to Plaintiff from Defendants O'Loughlin, USH and USH West, jointly and severally, compensatory damages in an amount to be proven at trial, in excess of $75,000 exclusive of interest and costs, including but not limited to damages in respect of excessive parking charges and Defendants' failure to pay an appropriate share of the parking fees to Plaintiff; award to Plaintiff from Defendants, jointly and severally, its costs incurred in prosecuting this action, including reasonable attorney's fees, as well as pre and post-judgment interest; award punitive damages to Plaintiff from each of the said Defendants; and grant such other and further relief as the Court may deem just and proper.


**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**


Respectfully submitted,

SPENCER FANE LLP

By: /s/ Gerald P. Greiman
        Gerald P. Greiman, #26668MO
        Timothy J. Ahrenhoersterbaeumer, #55136MO
        1 N. Brentwood Blvd., Suite 1000
        St. Louis, MO 63105
        (314) 863-7733 (Telephone)
        (314) 862-4656 (Facsimile)
        ggreiman@spencerfane.com
        tahrenhoersterbaeumer@spencerfane.com

        *Attorneys for Plaintiff*

28

SL 3666838.7

## **VERIFICATION**

I, James Ryffel, state that I am a member and manager of Plaintiff 401 South 18th Street,
LLC; I have read the foregoing Verified Complaint; and the factual allegations set forth therein
are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on April 27th, 2020.

James Ryffel

29